No. 101,905

STATE OF KANSAS, *Appellee*, v. PERRY PARKS, *Appellant*.

(280 P.3d 766)

Opinion filed July 20, 2012.

*Carl A. Folsom, III*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Michael A. Russell*, chief deputy district attorney, argued the cause, and *Robbin L. Wasson*, assistant district attorney, *Jerome Gorman*, district attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This direct appeal challenges defendant Perry Parks' convictions and his consecutive hard 20 life and 247-month sentences for the first-degree felony murder and aggravated robbery of Everett Suits in Kansas City in May 2008.

Parks raises eight questions on this appeal: (1) Did the district judge err in admitting evidence of Parks' post-*Miranda* silence? (2) Did violation of an order in limine prohibiting reference to Parks'

possession of illegal drugs violate Parks' right to fair trial? (3) Was Parks' right to confrontation violated by limitation of his counsel's cross-examination of a State's witness about the witness' immigration status? (4) Was the district judge's inclusion of an *Allen*-type instruction reversible error? (5) Did cumulative error deprive Parks of a fair trial? (6) Did the district judge err in sentencing Parks for both first-degree felony murder based on the underlying felony of aggravated robbery and for aggravated robbery? (7) Did the district judge err in sentencing Parks to the term of imprisonment at the upper limit of the applicable Kansas Sentencing Guidelines Act grid box without requiring a jury to find the existence of an aggravating factor beyond a reasonable doubt? and (8) Did the district judge err by sentencing Parks based on criminal history that was not proved to a jury beyond a reasonable doubt?

We affirm Parks' convictions and consecutive sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

Before trial, Parks' counsel filed a motion in limine seeking to prevent the State from introducing evidence that marijuana was found at Parks' residence when he was arrested. The district court judge granted the motion.

At trial, Parks admitted to killing Suits but argued he did so in self-defense. The State's theory was that Parks shot and robbed Suits over a debt. Four eyewitnesses to the shooting and the argument that led to it testified at trial.

Jeff Aleksaites testified that he observed a confrontation between Parks and Suits from his apartment window. Aleksaites saw the men standing in a parking lot by a pickup truck where they were arguing about money. When Suits attempted to leave in his truck, Parks prevented him from doing so and brandished a weapon. There was a brief struggle over the gun, and then Parks shot Suits. Aleksaites testified that Suits had a briefcase at the beginning of the argument; and, although Aleksaites never saw Parks with the briefcase, he saw him reach for it at one point and knew the briefcase was missing after the shooting.

Kara Krenzer testified that she witnessed the argument that led to the shooting from her car in the parking lot. Krenzer said she

had seen Parks once before when he tried to get Suits' attention for something related to work. Krenzer saw Suits come down a set of stairs to the lot, saw Parks greet him, and saw the men walk to Suits' truck. Krenzer, with her passenger, Christine Enfield, pulled her car near to Suits' truck. Krenzer overheard Parks asking for money and heard Parks say, "You are going to give me something," as he reached for Suits' briefcase. Suits pulled back on the briefcase. At that point, Parks reached into his pocket for a gun and pointed it at Suits through his shirt. Parks then looked at Krenzer and said, "Do you want to make this your problem?" Krenzer heard Suits say, "If you are going to shoot me, shoot me." Enfield then urged Krenzer to leave and call 911. Krenzer heard gunshots fired as she drove out of the lot. She proceeded around a corner to another parking lot and pushed an emergency call button to notify police. When she returned to the scene, she saw Parks walking away. At trial, she could not remember at trial if Parks was carrying anything with him. Krenzer had been unable to identify Parks in a photographic lineup pretrial, but she identified him as the shooter at trial.

Enfield also testified about what she saw and heard at the scene of the shooting. Her testimony largely repeated Krenzer's, and she identified Parks as the man who argued with Suits.

Pedro Morales testified at trial through the aid of an interpreter. Morales first testified outside of the presence of the jury that he was not promised anything with regard to his immigration status in exchange for his testimony. Before the jury, Morales said he was returning from work and heard a gunshot when he got out of his car. He ran toward the fence separating his apartment's parking lot from that of a neighboring building, looked into the other parking lot, and saw the man he later identified as Parks shooting Suits. Morales said he heard Suits yell, "Don't shoot!" Morales then saw Parks carrying a briefcase away from the scene. Morales wrote down the license plate number of the truck Parks drove away; and, when police arrived, Morales approached them and gave them the license plate number.

Other trial witnesses for the State included Morris Dwayne Erwin, Suits' cousin, who testified about Suits' construction business.

Erwin knew Parks from Parks' work for Suits on two different job sites. Erwin testified that Parks repeatedly called Suits, because Suits had written Parks a bad check and owed him money.

Pathologist Erik Mitchell, M.D., testified that Suits had a gunshot entry wound on the outside of his right arm and had two abrasions below his knees. Mitchell testified that Suits' arm had to have been raised at the time he was shot, but it was not possible for Mitchell to tell whether Suits was standing, on his knees, or lying down then.

Several members of law enforcement testified for the State.

One of the detectives who responded to the scene, Darren Koberlein, said he spoke with witnesses Aleksaites, Krenzer, Enfield, and Morales. Koberlein said that both Krenzer and Enfield reported that Suits had had a briefcase with him, and Krenzer told him she had observed Parks take the briefcase from the scene. Aleksaites told Koberlein he had seen a struggle over the briefcase. Morales told Koberlein that he saw the shooter take the briefcase. No briefcase was recovered from the scene. Nor were any spent cartridges or shell casings. Crime scene investigators did not examine or record findings about their observations of the bottom surface of Suits' truck.

Parks' vehicle was identified from the license plate number given to police by Morales, and Parks was arrested at his house early in the morning on the day after the shooting.

At the time of Parks' arrest, police collected ammunition, clothing, and cleaning solution from Parks' house. During questioning by the prosecutor at trial, Detective Bryan Block mentioned that "some marijuana" was found at Parks' house. Parks' counsel objected and told the district judge during a conference at the bench, "I don't know that the jury can set that aside," because the testimony placed "a negative stigma [on] the defendant." The judge asked whether Parks was seeking a mistrial; Parks' counsel first conferred with Parks and then said, "No, Judge, but I would just ask the jury to be instructed . . . [t]o disregard the statement that there were any illegal drugs found in the defendant's residence. I don't know how to cure it. That's my only problem." Parks' counsel also made clear that he was not requesting a specific written in-

struction on the issue. The district judge then orally announced to the jury that the defense objection was sustained and directed jurors to disregard the last question and answer.

Both Koberlein and Block testified about their interview of Parks after his arrest.

Block testified that Parks signed an advice of rights form before beginning his interview. Block also testified about the police department's interview protocol, which, he explained, consisted of a "preinterview" to "get to the meat of the matter" and then an attempt to get a taped statement. The prosecutor asked Block whether he was able to get a taped statement from Parks, and Block said, "No." The prosecutor asked Block why, and Block responded, "He did not want to go on tape."

At that point, Parks' counsel objected and said at a bench conference:

"It is fine for the State to say that he voluntarily gave a statement. It is fine for him to discuss the statement, but when they say he refused to give a statement, and asked for an attorney is what happened here, they are switching the burden to the defendant. They are saying he is responsible if he refuses, so we would object to him talking about refusing to give a further statement."

The prosecutor responded to this argument by saying that Parks "declined to go on the record with a formal taped statement" and "[t]hat's why we have a partial videotape instead of a full, because the defendant ultimately refused to go on tape, didn't refuse to give a statement, did ask for a lawyer towards the end, and that's where the questioning is halted." Parks' counsel acknowledged that Parks had given a "voluntary statement" but said the police stopped recording when Parks invoked his right to counsel. The district judge asked, "If you have an explanation on what the video is, why don't you just play it without any reference to him refusing[?]" The prosecutor said again that the State wanted to be able to "explain why this tape doesn't start at the beginning," and the district judge said, "Yeah, that's fine." Parks' counsel then agreed, stating, "If she just wants to get out of them, they did a video of part of the interview, that's fine."

Parks' counsel did not request that Block's earlier testimony about Parks not wanting to "go on tape" be stricken or that the

jury be instructed to disregard it. The district judge did neither *sua sponte*.

The videotaped portion of Parks' interview played to the jury at trial ended shortly after one of the two detectives conducting the interview asked, "So you don't want to give us a taped statement, is that what you're saying?" and Parks responded, "No. I think I should have a lawyer[. T]hen we'll tell the story again."

Block also testified that Parks told the detectives his side of the story on the shooting. According to Block, Parks admitted that he had been involved in the shooting but said that Suits attacked and he defended himself. Parks also stated that he went to the parking lot to collect money Suits owed him. His confrontation with Suits took place between two pickup trucks. Parks had brought a gun with him and moved it to his pocket, but he claimed that Suits struck him in the face and kicked him. Then the two men "got into a tussle" and were under one of the trucks. When Suits stood up and began trying to kick Parks, Parks shot Suits.

Koberlein described Parks as "forthcoming" during his interview by the detectives. Parks told them that he went to Suits' apartment to confront him about the debt, and Suits attacked him. Parks said he did not usually carry a gun but took one with him to the scene. Parks told the detectives that Suits struck him in the face and chest, and Parks dropped to the ground under a truck. When Suits tried to kick him, Parks fired two shots. Parks told Koberlein that Suits had a briefcase with him, but Parks did not take it.

Defense witnesses at trial included Parks' son, Patrick, and Parks himself.

Patrick said that he had introduced Suits to his father, and Patrick and his father completed two jobs for Suits. On the day of the shooting, Patrick and his father discussed bounced checks from Suits. Patrick told his father he needed to "watch out" for Suits because Suits had offered Patrick drugs and Patrick believed Suits was a drug dealer.

Parks' own testimony confirmed that he worked on two jobs for Suits and that Suits' checks bounced. On the day of the shooting, Parks said, Patrick warned him that Suits had tried to sell him drugs and told him to be careful. Parks had visited Suits before at his

apartment after the first job. On the day of the shooting, after the second job, Parks went to collect his money from Suits. Two "girls" would not let Parks into Suits' apartment building, but he saw Suits come outside. Parks said that Suits told him he had the money and that they shook hands and then went to Suits' truck. The two girls then pulled up, and Parks told them to go away because he and Suits "were trying to have a little bit of business." After they left, Parks said, Suits "sucker punched" Parks in the temple when Parks was expecting Suits to hand him the money. Parks said that he and Suits then started wrestling and that he got under the truck while Suits was kicking him. When Suits reached down and tried to pull Parks from under the truck, Parks said, Parks shot Suits because he was afraid for his life.

Parks also testified that he was upset but not angry when he went to see Suits. He said he had never pointed a gun at anyone before and conceded that he could have filed a lawsuit to try to collect the debt from Suits. Parks testified that he did not normally carry a gun, but he took one with him on the day of the shooting because he was afraid of Suits. Parks admitted that he had never told the police that his son warned him about Suits, and he conceded that he never saw a weapon on Suits the day of the shooting.

Parks also testified about his interview by Koberlein and Block, saying the detectives "went over and over the same thing over and over." Parks' counsel then asked, "And then ultimately you asked for an attorney and they terminated the interview?" Parks answered, "Yes."

The written instructions given to Parks' jury before deliberations began included a direction to "disregard any testimony or exhibit which [the court] did not admit into evidence." They also included a modified *Allen*-type instruction, see *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), which read:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the being. It is then up to the state to decide whether to resubmit the undecided charges to a different jury at a later time. Another trial would be a burden on both sides.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely

because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary."

## DISCUSSION

### Evidence of post-Miranda silence

Parks argues that the State committed reversible error by introducing evidence of what he contends was his post-*Miranda* silence, citing *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Specifically, Parks asserts, the State elicited "testimony that Mr. Parks asked to remain silent when the police wanted him to give a taped statement." The State responds that the testimony to which Parks points—Block's reference to Parks not wanting to "go on tape"—was merely an explanation for why there was no videorecording of the entire interview. The State argues that the detective's testimony about Parks' refusal to be taped is not equivalent to testimony about Parks' invocation of his right to remain silent.

We review this legal issue de novo. *State v. Tully*, 293 Kan. 176, 185, 262 P.3d 314 (2011).

*Doyle* established that when a defendant invokes his or her right to remain silent, the State may not use that silence against the defendant at trial. *State v. Kemble*, 291 Kan. 109, 123, 238 P.3d 251 (2010). As we have said:

"The familiar recitation set forth in *Miranda* . . . advises a defendant that he or she has the right to remain silent and warns that if he or she chooses not to exercise the right to remain silent, then anything that he or she says can and will be used against the person in a court of law. The corollary is that if a duly warned person *does* exercise the right to remain silent, then anything that the person did *not* say, *i.e.*, the person's silence, cannot and will not be used against them in a court of law." *Kemble*, 291 Kan. at 122.

" 'A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when

confronted by police officers but instead invoked his or her constitutional right to remain silent. *State v. Brinkley*, 256 Kan. 808, 820, 888 P.2d 819 (1995).' " *State v. Drayton*, 285 Kan. 689, 707, 175 P.3d 861 (2008) (quoting *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 [1998]).

Even if a defendant has "already spoken at length with the police," a *Doyle* violation can occur. "[A] defendant 'should be afforded the same right [under *Doyle*] after some discussion with the police when he remains silent as to matters later asserted at trial.' " *State v. Murray*, 285 Kan. 503, 521, 174 P.3d 407 (2008) (quoting *State v. Clark*, 223 Kan. 83, 89, 574 P.2d 174 [1977]).

Parks points to this court's decisions in *State v. Brinkley*, 256 Kan. 808, 820, 888 P.2d 819 (1995), and *State v. Gadelkarim*, 256 Kan. 671, 685, 887 P.2d 88 (1994), as well as the Court of Appeals' decision in *State v. DuMars*, 33 Kan. App. 2d 735, 748, 108 P.3d 448, *rev. denied* 280 Kan. 986 (2005), as support for his characterization of Block's statement as a *Doyle* violation. But nothing in *Brinkley*, *Gadelkarim*, or *DuMars* makes the link necessary for Parks' argument to succeed. None of these cases held that testimony about a defendant's refusal to make a statement *memorialized in a particular way*—for example, by means of the videorecording at issue here—to be an impermissible comment on the defendant's invocation of his or her right to remain silent. See *Brinkley*, 256 Kan. at 820-21 (defendant initially refused to speak to police on advice of counsel); *Gadelkarim*, 256 Kan. at 684 (defendant stated he wanted to speak with his attorney before answering questions); *DuMars*, 33 Kan. App. 2d at 747 (defendant stated she would not answer any more questions).

In other jurisdictions, there is conflicting authority on the question of whether a refusal to be videotaped or otherwise recorded implicates the right to silence protected by the *Doyle* rule.

In *Strickland v. Lee*, 471 F. Supp. 2d 557, 623 (W.D.N.C. 2007), one federal district court held that testimony about a defendant's refusal to write his statement was permissible:

"This Court finds that when [defendant/petitioner] indicated that he did not want to write out a statement going over the same information that he had just told the officers, Petitioner was not invoking his right to silence. Instead, [Petitioner] merely was declining to repeat in writing what he had just said out loud .

. . . This does not imply that [Petitioner] was no longer willing to talk to officers about the shooting. Therefore, Agent Underwood's trial testimony that Petitioner declined to convert his oral statement to a written one was a description of the conclusion of Petitioner's voluntary conversation with police and not a comment on Petitioner's 'silence.' "

*Cf. State v. Smith*, 107 Conn. App. 746, 753, 746 A.2d 926 (2008) (defendant did not refuse to speak to police, "conditioned his silence," stating preference to speak to State's attorney; *Doyle* inapplicable").

On the other hand, other courts have held such a refusal to memorialize a statement in a certain way implicates *Doyle*. See, e.g., *Arnold v. Runnels*, 421 F.3d 859, 864 (9th Cir. 2005) (noting that a defendant can "invoke[] his *Miranda* rights selectively, with respect to a tape-recorded interrogation"); *United States v. Jenkins*, 499 F. Supp. 2d 1268, 1276 (M.D. Fla. 2007) ("To be sure, there is a distinction here in that defendant did not invoke a right to discontinue making verbal statements. Rather, he declined to memorialize his verbal statements in a sworn written statement. However, this is not a distinction which diminishes [defendant's] *Doyle* position.").

We are persuaded by the reasoning of those courts that hold that a defendant's refusal to memorialize his or her statement in a particular form is not equivalent to an invocation of the right to silence implicating *Doyle*. In this case, Parks did not invoke his right to remain silent. In the words of one of the detectives, he was forthcoming in his interview. He merely refused to commit all of the same information he had already relayed orally to videotape. Under these circumstances, we conclude that the district judge's admission of Block's reference to Parks' unwillingness to "go on tape" was not error.

## Violation of Order in Limine

Parks argues he is entitled to reversal of his convictions because Block's testimony about marijuana seized from Parks' house violated the court's pretrial order in limine. The State concedes the violation but insists that the violation was "an isolated incident"; "the court took immediate corrective action"; and the evidence

against Parks was overwhelming. Thus, in the State's view, no prejudice resulted from the error.

"Where the trial court sustains an objection and admonishes the jury to disregard the objectionable testimony, reversal is not required unless the remarks are so prejudicial as to be incurable." *State v. Angelo*, 287 Kan. 262, 285, 197 P.3d 337 (2008) (citing *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 [2004]).

We agree with the State. In context, the violation was very brief; its vagueness limited its persuasive power; and the misbehavior it implied—possession of marijuana—was minor when compared to the seriousness to the crimes charged. In addition, the evidence amassed against Parks was strong. He admitted he brought a gun to the scene and shot Suits. Four eyewitnesses described the argument leading to the shooting and the shooting itself. And their largely consistent observations stood in contrast to Parks' self-defense explanation. Finally, the district judge reacted swiftly and appropriately to the violation of the limine order, and the curative oral instruction he gave was precisely that requested by the defense. Under these circumstances, reversal is not compelled.

*Limitation of Cross-Examination on State Witness' Immigration Status*

On this issue, Parks argues that he should have been allowed to cross-examine Morales "regarding his status as an undocumented alien to show that he had a very strong incentive to provide trial testimony consistent with that previously given to the police." Parks maintains that in this way Morales' immigration status was relevant to Morales' credibility, a subject Parks had a right to pursue under K.S.A. 60-420 and the Confrontation Clause of the Sixth Amendment to the United States Constitution.

The State responds that Morales testified outside of the presence of the jury that he was not promised anything in exchange for his testimony. This question—not whether Morales was in the United States illegally—was the only relevant inquiry. The State also argues that Parks' allegation that Morales was being untruthful was "unsubstantiated" and that Parks could have cross-examined Morales about his denial of an immigration-related incentive but did

not. In the event we hold that the district judge erred in limiting cross-examination of Morales, the State argues that any error was harmless because Morales knew "details that could not have been fabricated," including Parks' license plate number and the fact that Parks' left the crime scene with Suits' briefcase.

"The scope of cross-examination is subject to reasonable control by the trial court." *State v. Corbett*, 281 Kan. 294, 307, 130 P.3d 1179 (2006) (citing *State v. Atkinson*, 276 Kan. 920, 925, 80 P.3d 1143 [2003]). And a district court judge's "decision to limit cross-examination is reviewed using an abuse of discretion standard." *Corbett*, 281 Kan. at 307-08; see *U.S.D. No. 232 v. CWD Investments*, 288 Kan. 536, 568, 205 P.3d 1245 (2009); *Atkinson*, 276 Kan. at 924; *State v. Albright*, 271 Kan. 546, 550, 24 P.3d 103 (2001). "Discretion is abused when judicial action is arbitrary, fanciful, or unreasonable." *State v. Gonzalez*, 290 Kan. 747, 755, 234 P.3d 1 (2010). This court has "unlimited review of legal conclusions upon which a district court judge's discretionary decision is based," and a district judge's error of law constitutes an abuse of discretion. *Gonzalez*, 290 Kan. at 755. Further, "even if a decision is entrusted to the discretion of a district court judge, and he or she correctly understands and applies the controlling legal standards, the facts upon which the discretionary decision must depend may still be challenged on appeal as unsupported by substantial competent evidence in the record." *Gonzalez*, 290 Kan. at 755-56.

However, a party who chooses to limit questioning on cross-examination cannot complain of error on appeal. See *State v. Herbert*, 277 Kan. 61, 78, 82 P.3d 470 (2004). Because we conclude, after careful review of the entire record before us, that Parks got exactly what he requested from the district judge, we do not reach the issue of whether there was legal error—and therefore an abuse of discretion—in the judge's limitation of Morales' cross-examination.

Before trial, the State filed a motion in limine for "an order prohibiting defendant counsel from referencing or eliciting testimony concerning witness Pedro Morales' immigration status." The State argued: "In support of such motion, the State contends that Mr. Morales' immigration status is irrelevant to these proceedings

and any exploration thereof could improperly imbue racial bias concerning his testimony."

During a pretrial hearing on the motion and other matters, prosecutor Robbin L. Wasson, defense counsel Gary Stone, and the district judge engaged in the following colloquy:

"MR. STONE: Judge, also there is an individual in this case we believe is not a citizen of the United States and I want to verify for the record that there has been no assurances or other promise made to him that he is immune from INS or any other proceeding because he is testifying.

"MS. WASSON: Who is that?

"MR. STONE: Pedro Morales.

"MS. WASSON: Again, if there were any conversations of that nature, Judge, I am unaware of them, but I can track that down.

"THE COURT: Alright."

No pretrial order in limine on this issue appears in the record on appeal.

At trial, Morales' immigration status again was the subject of discussion among the court and counsel outside of the jury's presence. The prosecutor argued:

"I am concerned that Mr. Stone would reference his immigration status. Per our prior hearing, I did inquire of Mr. Morales, 'Did you discuss that with the detectives, did anyone make you any promise or anything like that?' He said no. In the process of responding to me, and I didn't ask him, 'What is your immigration status,' but in the process of responding, he happened to mention to me that he is here illegally. Judge he, you know, I can't imagine how that would impact his testimony, I mean, he wasn't approached, wasn't threatened. There is certainly nothing of that sort to be found here, and I think his immigration status could unduly prejudice members of the jury against his testimony, and I would ask that counsel be limited and prohibited from mentioning that."

In response, Parks' counsel argued:

"Judge, we would object. You know, he is living here illegally, and I understand the Court's initial reaction to that, but he has come to the State and he has told them, 'I am here illegally,' and the State has said 'You are subpoenaed and you need to appear in Court and you need to testify,' and I would assume that is, 'Testify truthfully according to what you have told the police in the past.' *The problem is that I should be entitled to inquire if he has been promised that immigration is not going to be contacted.* Implicitly I would assume that's what he has been told. 'Come here and testify, nothing is going to happen to you, nobody is to be contacted.' " (Emphasis added.)

Parks' counsel then sought the district's judge's permission to ask Morales:

" 'You are here, you are illegal in our country,' *just very limited.* 'You are here illegal[ly] in our country, correct, and you have talked to the State and you have told them you are here illegally, correct, and my question to you, sir, is have you been told that nothing will happen to you as long as you provide truthful testimony?' *If he says, 'We haven't discussed it,' then I am done with my question."* (Emphasis added.)

The district judge determined, "Well, we can do that outside the presence of the jury, if you want before he testifies, that would take care of your problem, and that way the jury doesn't hear it." Parks' counsel responded, *"That would be fine,"* and the State agreed to the suggested procedure. (Emphasis added.)

As mentioned in the factual background section above, before Morales testified at trial before Parks' jury, he was subjected to voir dire by counsel. When questioned by the State, Morales said that he had not been promised anything with regard to his immigration status by the police, the District Attorney's office, the Immigration and Naturalization Service, Immigration and Customs Enforcement, or any other governmental agency. When asked by Parks' counsel if he had conversations with the prosecutor regarding his immigration status, Morales responded, "No." Morales also responded no when asked if he ever told the prosecutor that he was in the country illegally. When Parks' counsel asked directly if Morales was legally in the country, Morales responded, "No comment."

This exchange prompted the district judge to suggest that Morales' immigration status was not relevant in Parks' case. Parks' counsel was permitted further argument on the point, asserting Morales' testimony on voir dire contradicted what the prosecutor had said earlier about Morales' admission to her about his undocumented immigration status. The prosecutor denied having said that Morales made such an admission; rather, she said that, when she spoke to Morales, she merely "was under the impression and picked up on the fact that he is here illegally" and that she had been "trying to be honest with [Parks' counsel] about that." The prosecutor repeated her argument that it would be improper to

question Morales about his immigration status before the jury. The district judge again suggested that Morales' immigration status was irrelevant, and defense counsel responded, "Now I am asking this witness under oath whether he has at all informed [the State] that he is here illegally. I understand that may not be relevant." Parks' counsel continued:

"Your Honor, under oath he is saying that he has not been led to believe or promised anything for his testimony, in our opinion, and this is why I am objecting, is not right. He knows he is not going to get in trouble if he comes here and testifies. He has been told, as long as you come here and testify, not maybe threatened or promised, but he knows implicitly that he is not going to be arrested or taken into custody if he comes here and testifies."

Finally, the district judge said that counsel had made a sufficient record of the issue and called the jury back into the courtroom.

The motion and hearing and trial transcripts demonstrate that Parks' counsel did not argue before the district judge that Morales' undocumented immigration status inevitably demonstrated his general dishonesty and therefore was admissible to impeach him as a matter of law. Instead, the defense argument was limited to the need for discovery and exposure of any assurances Morales received from law enforcement or the federal government regarding Morales' immigration status. Once Morales testified on the limited voir dire defense counsel successfully sought that Morales had received no promises and was subjected to no threats based on his immigration status, the inquiry came to its natural end. Defense counsel may not have believed Morales, but, as defense counsel had set the terms of the debate, there was nothing uncovered on the voir dire that merited placement before the jury. The decision of the district judge on this point was correct.

## Allen-*type Instruction*

Parks did not object to the giving of the modified *Allen*-type instruction at trial, and thus he must meet a clearly erroneous standard on appeal. K.S.A. 22-3414(3); see *State v. Magallanez*, 290 Kan. 906, 925, 235 P.3d 460 (2010) (citing *State v. Ellmaker*, 289 Kan. 1132, 1145, 221 P.3d 1105 [2009]). Under this standard, the question is "whether [the court is] firmly convinced there is a real

possibility the jury would have rendered a different verdict if the error had not occurred." *State v. Salts*, 288 Kan. 263, 265-66, 200 P.3d 464 (2009).

In particular, Parks argues that the jury would have rendered a different verdict absent the *Allen*-type instruction error because the evidence that Parks took Suits' briefcase was weak. The State counters that the evidence regarding the taking of the briefcase was not weak and that the brevity of the jury's deliberations and its lack of questions demonstrate its decisions to convict were not difficult.

This court has examined challenges to this type of instruction in many earlier cases. See, *e.g.*, *Magallanez*, 290 Kan. at 925-26; *Salts*, 288 Kan. at 264-67. Although we have concluded that the language " '[a]nother trial would be a burden on both sides" is error because it is "misleading and inaccurate," as well as "confusing," see *Salts*, 288 Kan. at 266, reversal is not automatic.

In this case, we are not firmly convinced that, had the error not occurred, there is a real possibility the jury would have rendered a different verdict. Despite Parks' insistence that he did not take Suits' briefcase, multiple witnesses placed the briefcase with Suits at the beginning of the altercation and with Parks after the shooting. On this record, the giving of the *Allen*-type instruction does not require reversal.

*Conviction and Sentencing for Both Aggravated Robbery and Felony Murder*

Parks' next argument on appeal challenges his conviction and sentencing for both aggravated robbery and felony murder. He asserts that, because the underlying felony for the felony murder was the aggravated robbery, aggravated robbery was also a lesser included offense of felony murder; he thus argues he cannot be convicted and sentenced for both the greater and lesser crimes.

Parks concedes that he did not make this argument before the district judge but argues that he may mount this challenge on appeal "in order to serve the ends of justice and prevent a denial of fundamental rights." *State v. Nguyen*, 285 Kan. 418, 433-34, 172 P.3d 1165 (2007) (citing *State v. Simmons*, 282 Kan. 728, 743, 148

P.3d 525 [2006]; *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 [1984]). Accepting for purposes of argument that this exception excuses the requirement of issue preservation in the district court, we move to discussion of the merits of Parks' argument.

The question of whether a crime is a lesser included offense is a question of law over which this court has unlimited review. *State v. Sandifer*, 270 Kan. 591, 599, 17 P.3d 921 (2001).

K.S.A. 21-3107(2) states: "Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." It defines a lesser included crime as, among other things, "a crime where all the elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 21-3107(2)(b).

Parks acknowledges that this court has nevertheless held "that the legislature intended separate convictions and punishments for the felony murder and the collateral felony." He argues that K.S.A. 21-3107(2)(b) and K.S.A. 21-3436 do not support this earlier conclusion. Specifically, he asserts that "the provisions of K.S.A. 21-3436 only describe when felony murder results in conjunction with certain underlying felonies—it does not state when multiple convictions and multiple punishments can be imposed for felony murder and the underlying felony." According to Parks' reading, K.S.A. 21-3436(a) "merely states when felony murder can be charged"; the statute "does not discuss whether convictions 'merge' for purposes of multiplicity—it discusses when offenses merge for purposes of the felony murder doctrine." Parks argues that the current version of K.S.A. 21-3107(2)(b) requires his aggravated robbery conviction to be reversed as a lesser included offense of felony murder.

The State, in turn, relies upon our precedents that Parks now argues were arrived at in error. Quoting *State v. Holt*, 260 Kan. 33, 37, 917 P.2d 1332 (1996), the State argues that the "felony-murder doctrine is a distinct legal theory from the doctrine of lesser included offenses." The State also cites *State v. Mims*, 264 Kan. 506, 517, 956 P.2d 1337 (1998), and *State v. Rueckert*, 221 Kan. 727, 733, 561 P.2d 850 (1977), for the more specific holding that the crimes of aggravated robbery and felony murder do not merge. See

generally *State v. Appleby*, 289 Kan. 1017, 1032-33, 221 P.3d 525 (2009) (inherently dangerous felony statute, K.S.A. 21-3436, applies to felony-murder statute, K.S.A. 21-3401(b); K.S.A. 21-3436 "provides that the homicide and the inherently dangerous felony are distinct and do not merge").

The first-degree murder statute, K.S.A. 21-3401, defines felony murder as "the killing of a human being committed . . . (b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A 21-3436." K.S.A. 21-3436(a)(4) provides that "aggravated robbery, as defined in K.S.A. 21-3427," is "deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 . . . as not to be an ingredient of the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401." In other words, an inherently dangerous felony such as aggravated robbery does not merge into felony murder, and a defendant may be convicted and sentenced for both offenses, even when the aggravated robbery is the underlying felony for the felony murder.

One of our most recent rejections of Parks' interpretation of the statutory scheme came in *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), an exhaustive review of multiplicity law in Kansas and the tandem double jeopardy concerns it can exacerbate or alleviate. We observed there: "The United States Supreme Court has stated that if the legislature has explicitly authorized multiple punishment, the judicial inquiry is at an end; multiple punishment is authorized and proper," including in the specific context of conviction "of robbery and felony murder with robbery as the underlying felony." *Schoonover*, 281 Kan. at 468, 469 (citing *Missouri v. Hunter*, 459 U.S. 359, 368-69, 103 S. Ct. 673, 74 L. Ed. 2d 535 [1983]).

We are not persuaded that we should revisit and revise our *Schoonover* analysis today. We also note that Parks' argument on this issue implicitly—and erroneously—assumes that proof of a completed aggravated robbery is necessary to the sufficiency of proof of a felony murder. The felony-murder statute clearly does not require this. Rather, a killing committed "in commission of,

attempt to commit, or flight from an [underlying] inherently dangerous felony" such as aggravated robbery is sufficient to support a felony-murder conviction. See K.S.A. 21-3401(b).

Parks is not entitled to reversal of his aggravated robbery conviction on his argument that aggravated robbery was a lesser included offense of the felony murder on which he stands convicted.

*Cumulative Error*

Cumulative error requires reversal of a conviction "when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial." *State v. McCaslin*, 291 Kan. 697, 732, 245 P.3d 1030 (2011) (citing *State v. Sharp*, 289 Kan. 72, 106, 210 P.3d 590 [2009]).

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. [Citation omitted.]" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

"In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. [Citations omitted.]" *Tully*, 293 Kan. at 205-06.

Reversal for cumulative error is not required if the evidence against a defendant is overwhelming. *McCaslin*, 291 Kan. at 732 (citing *State v. Reid*, 286 Kan. 494, 523-24, 186 P.3d 713 [2008]).

Parks argues in his brief that the multiple trial errors he asserted deprived him of a fair trial. We have now rejected three of his assertions of error—admission of evidence of post-*Miranda* silence, limitation of cross-examination on a State witness' immigration status, and conviction and sentencing for both aggravated robbery and felony murder. The question is therefore whether the two acknowledged instances of trial error—violation of the limine order and the giving of the *Allen*-type instruction—require application of the cumulative error rule and compel reversal of Parks' convictions.

They do not. Examining the two errors in the context of the record as a whole persuades us that they were relatively insignificant and bore no relationship to each other.

With regard to the limine order violation, the district judge dealt efficiently and as effectively as possible with the error as soon as it occurred, directing the jury to disregard the improper brief reference to the seizure of "some marijuana" from Parks' home. Although defense counsel observed at the time that it would be difficult to unring the drug-possession bell, the defense got the contemporaneous admonition it sought and, per its clear expressed preference, did not get any undue reemphasis of the particular error at the time the jury was instructed before deliberations. Rather, at that point, the judge merely gave a general instruction that testimony not admitted into evidence by him was to be disregarded. The *Allen*-type instruction error also appears to have been minor in the context of the entire record, especially in view of the State's strong evidence. It is rare for the State to have four eyewitnesses to a fatal shooting and likely that the strength of this line-up contributed to the jury's speedy disposition of the charges. In such circumstances, the erroneous language in the instruction about the burden of another trial is unlikely to have had much impact. For all of these reasons, Parks is not entitled to reversal and a new trial.

*Sentencing to Upper Term in Grid Box*

Parks challenges the imposition of the upper term in the grid box under the Kansas Sentencing Guidelines Act for his aggravated robbery conviction without a finding of fact on an aggravating factor made by a jury, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). This court has repeatedly rejected Parks' argument, see, *e.g.*, *State v. Johnson*, 286 Kan. 824, 842, 848-51, 190 P.3d 207 (2008); and we do so again today. There was no error on this ground.

*Sentencing Based on Criminal History*

Parks also argues that the district judge's use of his prior convictions to enhance his sentence without requiring the State to prove his prior convictions to a jury beyond a reasonable doubt was

prohibited under *Apprendi*. This court has repeatedly rejected Parks' argument, see, *e.g., State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002); and we do so again today. There was no error on this ground.

The judgment of the district court is affirmed.