No. 69,723

STATE OF KANSAS, *Appellee*, v. SHERRELL GARY BRINKLEY, *Appellant*.

(888 P.2d 819)

Opinion filed January 27, 1995.

*Stephen Douglas Bonney*, special appellate defender, of Kansas City, Missouri, argued the cause, and *Jessica R. Kunen*, chief appellate defender, of Topeka, was with him on the brief for appellant. *Sherrell Gary Brinkley*, appellant, appeared on a separate brief pro se.

*Frank E. Kohl*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Sherrell Gary Brinkley appeals his first-degree murder conviction, K.S.A. 1989 Supp. 21-3401, resulting from the May 1990 shooting death of Everett "Skeet" Bishop. Brinkley alleges numerous errors in his conviction and sentence.

Focusing on the five issues raised by the appellate defender, we consider whether the trial court erred in: (1) refusing to give a cautionary instruction on informant testimony; (2) refusing to allow Brinkley access to files concerning the investigations of two other homicides; and (3) giving an aiding and abetting instruction when the charging document did not allege aiding and abetting. We also review whether: (4) comments on Brinkley's post-arrest silence require reversal under *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S.Ct. 2240 (1976); and (5) a previous conviction for attempted bank robbery may serve as a predicate offense under the Habitual Criminal Act, K.S.A. 1989 Supp. 21-4504(a) (the HCA).

The trial court sentenced Brinkley to two consecutive life terms under the HCA, based on Brinkley's prior conviction for attempted bank robbery. Our jurisdiction is under K.S.A. 1993 Supp. 22-3601(b)(1) (a direct appeal from a class A felony conviction).

Brinkley's trial lasted six days. Twenty witnesses testified, and over 40 exhibits were introduced. The fundamental question of who killed Skeet Bishop turned on a credibility contest between Brinkley and the State's primary witness, Eric Montgomery. Both men: (1) admitted to being present when Bishop was murdered outside Bishop's home; (2) told different stories about the circumstances leading up to the shooting; (3) implicated one another for the shooting; (4) admitted they would lie, and had lied, to avoid returning to prison; and (5) testified they helped conceal the body out of fear of being implicated in the crime or being physically harmed by the other. We affirm the conviction. The case is remanded for resentencing because of an erroneous application of the HCA.

## Facts

The facts may be summarized in three parts: (1) how Brinkley, Montgomery, and Bishop came to know one another; (2) Montgomery's story, which formed the basis for the State's theory that Brinkley committed the murder; and (3) Brinkley's story, which anchored his defense that Montgomery committed the murder

but pointed the finger at Brinkley when promised favorable treatment by the State.

### Connections between Brinkley, Montgomery, and Bishop

Montgomery and Brinkley met in the Leavenworth Federal Penitentiary. After their releases from prison they kept in touch. Montgomery lived in Kansas City, Missouri, while Brinkley moved around from North Dakota to Colorado, and eventually to Florida.

At the time of the events leading to Bishop's murder, Montgomery and Brinkley were engaged in various illegal activities, individually and together. The illegal scheme that brought Bishop into the picture involved stolen automobiles.

Montgomery and Bishop first became acquainted in 1987 or 1988 when Montgomery, as a favor to another friend in prison, helped scare away some "young individuals" who had been "terrorizing" Bishop by shooting at his house. Montgomery found Bishop to be a convenient friend because Bishop could purchase firearms and ammunition, whereas Montgomery, with a prior felony conviction, could not. Montgomery carried a key to Bishop's house, which contained a well-supplied arsenal of handguns, rifles, and shotguns.

One day, Bishop was standing nearby while Montgomery was on the telephone with Brinkley. Brinkley wanted Montgomery to come to Florida and pick up a car and drive it back to Kansas City. Bishop heard Montgomery talking about a trip to Florida and asked if he could go. Montgomery cleared Bishop's participation with Brinkley. In February 1990, Montgomery and Bishop flew together on one-way tickets to Tampa. Brinkley met them at the airport and drove them to Jacksonville, where they met Henry Dyer Wiggins, a friend of Brinkley's. Montgomery and Bishop picked up a car and drove it back to Kansas City.

In early May 1990, Montgomery and Bishop again traveled south, this time to North Carolina, to pick up another car from Brinkley. They stayed one night and started back the next morning.

A few weeks later, Brinkley came to Kansas City, and during his visit the Bishop murder took place. Brinkley's reason for trav-

eling to Kansas City was a source of dispute at trial, as were most of the facts from that point forward. However, the stories regarding Brinkley's visit were consistent at least on the following facts: Brinkley and Montgomery went out to Bishop's house twice, once on a Friday and again on Saturday. During the second visit, the three men took some guns out behind Bishop's house, supposedly for target practice. Once outside, Bishop was shot and killed. Brinkley and Montgomery placed Bishop's body in a 55-gallon steel barrel, welded the lid shut, chopped holes in the barrel, and rolled it into the Missouri River, the body was never found. Brinkley left town the next day.

### The State's Theory: Montgomery's Story

According to Montgomery, Bishop's downfall began on their North Carolina trip to pick up a stolen Datsun 280Z from Brinkley. On the morning of their return departure, Brinkley escorted the two men to the highway because the streets in his neighborhood were hard to navigate. Brinkley drove his own car, Bishop drove the 280Z, and Montgomery drove the AMC Eagle in which he and Bishop had driven to North Carolina. Suddenly, Bishop "became very frightened" and started driving erratically. "[H]e would either go too slow or too fast . . . either go ninety miles an hour or twenty-five miles an hour on the freeway," and "he ran stop signs," and "came out of a side street and pulled on to the main highway." Bishop's general state of panic resumed, Montgomery related, when the 280Z broke down in St. Louis. Montgomery and Bishop abandoned the 280Z in St. Louis and drove on to Kansas City together in Montgomery's car.

When Montgomery called Brinkley from Kansas City, Brinkley was upset about the 280Z being abandoned in St. Louis. Brinkley was concerned that Bishop would become scared and tell the police what he knew about Brinkley's illegal activities. Montgomery said he tried to alleviate Brinkley's fears and tried to explain he had confidence in Bishop.

Brinkley called Montgomery in late May and said he was coming through Kansas City on his way to Colorado, and that he was going to "do something about Mr. Bishop." They went out to

Bishop's house, where Brinkley argued with Bishop while Montgomery tried to "smooth things over." After two or three hours, Brinkley and Montgomery left. Montgomery had the impression that the problems were worked out.

Brinkley wanted to see Bishop again, however, so he and Montgomery returned to Bishop's home. When they arrived, Bishop was momentarily away. Brinkley and Montgomery let themselves in and "puttered around" until Bishop returned. The three men "talked a little bit" and then decided to go outside and shoot some guns that Bishop kept in his basement. Montgomery could not remember who suggested shooting the guns. The three men loaded some guns in the back of Bishop's van and went out to the side of Bishop's barn. Montgomery drove the van, while Brinkley and Bishop walked.

Brinkley and Bishop removed a Tech-9 nine millimeter semiautomatic handgun from its plastic case and installed a silencer. Meanwhile, Montgomery was facing the back of the van, loading clips for the other guns. Brinkley and Bishop then walked together a short distance away. Moments later, Montgomery "heard a noise or something," and he turned around in time to see Brinkley shooting Bishop, "ten or twelve times" in the chest with the Tech-9 from about six feet away.

Montgomery then heard Brinkley say, "He's not dead, he's not dead," and watched as Brinkley unholstered a .45 handgun and shot Bishop in the head. Montgomery, said he was "upset" and "scared" by the shooting because his friend had just been killed and because the killing occurred within view of the highway and he was afraid a passerby might have seen them.

Montgomery quickly became concerned that he would catch "all the heat" for Bishop's death because he was a known associate of Bishop's, while Brinkley was unknown in the area. Montgomery therefore agreed that the body should be concealed. The two men placed the body in a steel, 55-gallon barrel, loaded it into the van, and removed some guns and valuable coins from Bishop's basement. They took the drum to Montgomery's house, where Montgomery welded the lid shut. Montgomery and Brinkley drove to a place along the Missouri River where Montgomery knew they

could reach the shoreline without being seen. Brinkley chopped holes in the barrel. The two men rolled the barrel into the river and watched it float downstream and sink.

Brinkley left the next day and returned to Florida, calling several times over the next few weeks to ask about what was being reported on Bishop's disappearance.

Montgomery was contacted in July 1990 by police regarding Bishop's disappearance. The police knew about Montgomery's connections with Brinkley and the stolen car scheme, as Bishop had apparently shared such information with a third party. The police told Montgomery they suspected him of murdering Bishop, but at that point Montgomery decided it was best to play ignorant.

A year later, two things changed Montgomery's mind about playing ignorant. He grew tired of the constant surveillance of his activities by ATF agents. More important, however, was a phone conversation he had with Brinkley in the early part of 1991. Brinkley told him that he wanted Montgomery to come to Florida to pick up some drugs from a location in the Everglades. Montgomery believed that what Brinkley really wanted to do was to "feed [him] to the alligators" to keep him from talking about the Bishop murder. Montgomery decided to give police a statement after he was offered a "deal" that he would not be charged with anything concerning the Bishop case "as long as there was no indication that I pulled the trigger."

### Wiggins' Testimony

Wiggins, a friend and fellow car thief of Brinkley's in Florida, also testified for the State. According to Wiggins, Brinkley said before leaving for Kansas in May 1990 that he was going to "do something about" the "problem" with Bishop stating, "I have to go take care of the problem." Upon Brinkley's return to Florida, he told Wiggins, "The Skeet shoot is over." Wiggins also testified that Brinkley once told him that he thought Montgomery would do whatever he (Brinkley) told him to do. From Wiggins' observations of Montgomery and Brinkley together, Wiggins did not think Montgomery controlled Brinkley.

### The Defense Theory: Brinkley's Story

A main element of Brinkley's defense was to discredit Mont-

gomery's story. Montgomery essentially admitted on cross-examination that he would lie to stay out of prison. He admitted lying to police during early stages of the Bishop murder investigation to protect himself, Brinkley, or other friends. The defense also showed that Montgomery gave inconsistent statements to police and inconsistent testimony at trial. For example, Montgomery did not say anything about the .45 shot to Bishop's head in his first two statements to police. Also, Montgomery initially told police he and Brinkley waited until dark to dump Bishop's body in the river, but he later changed his story and said they dumped it before dark. The defense also suggested that it was not until prosecutors put a "squeeze" on Montgomery and offered him a deal that Montgomery began talking about the murder. Montgomery was informed that Brinkley was in a Florida jail looking at "federal time" for grand theft and might start talking about the Bishop murder in exchange for leniency. Brinkley blamed the killing on Montgomery, whom he characterized as a "potential time bomb." He denied ever having been able to control Montgomery. Brinkley's testimony tracked with Montgomery's concerning Bishop's first visit to Florida. As for the visit in North Carolina, Brinkley said he could not recall Bishop "driving erratically."

Brinkley testified that he received a call from Montgomery a couple of days after Bishop and Montgomery left North Carolina and learned that the 280Z broke down in St. Louis and was abandoned there. Montgomery then mentioned that Bishop was driving erratically, and was "operating in panic mode." Brinkley said, however, that he was not concerned about Bishop. His only big concern was getting the stolen 280Z out of North Carolina, which he had accomplished. According to Brinkley, Montgomery was concerned about Bishop's behavior, not because of Bishop's knowledge of the stolen car scheme, but because the two of them had recently killed a man named Lloyd Folsom, and Montgomery was afraid that if Bishop was ever questioned, he would implicate Montgomery in that murder.

Brinkley came to Kansas City in May 1990 at Montgomery's request. Montgomery wanted him to "try to evaluate Mr. Bishop's behavior." Brinkley agreed to make the long drive to Kansas City

to "evaluate" Bishop at Montgomery's insistence because he felt threatened by Montgomery and did not want to upset him: "Mr. Montgomery knew where I lived and knew where my family lived." Brinkley "didn't feel like there was a problem with Mr. Bishop at all." His main purpose in going to Kansas City was to "calm Mr. Montgomery down."

After Brinkley arrived in Kansas City, he and Montgomery went to Bishop's house, where the three men sat around and talked for a couple of hours. On the way home, Brinkley told Montgomery that Bishop "seems perfectly all right to me," but Montgomery responded, "[L]et's spend some more time with him and see what you think."

The next day, the two men returned to Bishop's house. Brinkley testified that after they "sat around for awhile," Montgomery "suggested we go down to the barn and fire some weapons." Montgomery had given no indication that he intended to harm Bishop. The three men chose some guns and carried them down near the barn. They walked; nobody drove the van. Brinkley started walking toward a nearby pond to "see if I could see any turtles or snakes or something we could fire the weapons at." Suddenly, Brinkley heard a noise, and when he turned around he saw Montgomery "standing over Mr. Bishop with a .45 in his hand." Montgomery shot Bishop once with the .45; there were never any shots fired with the Tech-9, according to Brinkley.

Brinkley "stood there . . . in disbelief for a moment," and then walked over to where Montgomery was standing. Montgomery told him to go to the house, get the van, put a barrel in the van, and return. Consistent with Montgomery's testimony, Brinkley said the two men took guns and coins from Bishop's house before moving on to Montgomery's house, where they welded the barrel shut. Then, they went to the Missouri River, where Montgomery chopped holes in the barrel. Both men rolled it into the river and watched it drift downstream and sink.

The next day, Brinkley left for Florida, stopping by Montgomery's house on his way out of town. Montgomery gave him a suitcase and some weapons and told him to place them in a car in a storage facility in Charlotte, North Carolina, implying that

he would pick up the car and its contents later. Brinkley said he followed those instructions.

## Discussion
### Failure to Give Instruction on Informant Testimony

Brinkley contends that the trial court erred in failing to instruct the jury according to the "paid informant" instruction, PIK Crim. 3d 52.18-A, which provides: "You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence." Brinkley alleges that the instruction was necessary because the State called three witnesses who received benefits for their trial testimony: Montgomery, Wiggins, and David Watson, a Florida jailmate of Brinkley's. Watson testified that Brinkley mentioned the Kansas murder investigation and said he (Brinkley) had nothing to worry about because "[d]ead people can't talk . . . [p]eople in a barrel, in a river."

Where a criminal defendant claims error in the trial court's failure to provide a certain instruction, our standard of review depends on whether the defendant made a timely request for, or objected to the failure to give, the instruction at issue. See *State v. Whitaker*, 255 Kan. 118, 872 P.2d 278 (1994); *State v. Novotny*, 252 Kan. 753, 755-56, 851 P.2d 365 (1993). If a request was properly made, we view the evidence in the light most favorable to the requesting party in considering whether there was evidence supporting the requested instruction. *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992).

Where no request was made, however, we will reverse only if the trial court's failure to give the instruction was clearly erroneous, *i.e.*, we reach a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict. *State v. Pennington*, 254 Kan. 757, 765-66, 869 P.2d 624 (1994); *Novotny*, 252 Kan. at 755.

Specifically with respect to informant testimony, we have stated:

"[O]rdinarily it is error to refuse to give a cautionary instruction on the testimony of a paid informant or agent where such testimony is substantially uncorrobor-

ated and is the main basis for the defendant's conviction. Where, however, no such instruction is requested nor objection made to the court's instructions, and such testimony is substantially corroborated, the absence of a cautionary instruction is not error and is not grounds for reversal of the conviction." *Novotny*, 252 Kan. at 760.

At trial, Brinkley's counsel requested a "jail informant" instruction, but made no request for the paid informant instruction that Brinkley proposes on appeal. Counsel cited no PIK number when one was requested by the trial court and even conceded that the requested instruction could not be found in PIK. Both the State and the trial court expressly assumed that the jail informant instruction referenced Watson's testimony, since Watson was in jail with Brinkley. Counsel did not attempt to correct the State or the court by arguing, as Brinkley now argues on appeal, that he was requesting a paid informant instruction. The clear implication of trial counsel's admission that the instruction he was seeking had no PIK analogue is that he was not requesting the paid informant instruction found at PIK Crim. 3d 52.18-A. Thus, we review Brinkley's contention as if no request for a paid informant instruction was made at trial.

We note that the record does not establish that Wiggins or Watson received any benefits for their testimony against Brinkley in the instant case. Montgomery, meanwhile, clearly received a benefit for his testimony—immunity from prosecution in the Bishop murder. The jury received a cautionary accomplice instruction applicable to Montgomery. It stated:

"An accomplice witness is one who testifies that he was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

Montgomery's testimony is the only direct evidence that Brinkley committed the murder. There were no other witnesses to the murder, and the body was never found. The testimony of Wiggins and Watson, who heard Brinkley say, "The Skeet shoot is over," and "Dead people can't talk," respectively, provide corroborating evidence from which a jury could infer that Brinkley was the killer. Wiggins' testimony that Brinkley said Montgomery would do whatever he (Brinkley) said and that Brinkley was going to

Kansas to take care of the Bishop "problem" also lend support to Montgomery's version of events.

The remainder of the State's evidence, consisting mainly of items found in Brinkley's possession, phone records, items found at the crime scene, and testimony of various investigators and witnesses who knew Brinkley or Montgomery, was all offered in an attempt to corroborate Montgomery's story.

We conclude that the trial court's failure to submit a paid informant instruction to the jury was not clearly erroneous. We reason that: (1) no paid informant instruction was requested, (2) Montgomery's benefit for testifying was placed before the jury and was emphasized by Brinkley in cross-examination and in closing argument, (3) the record does not establish that Wiggins and Watson were paid informants, and (4) there was substantial evidence introduced to corroborate Montgomery's story.

### Limiting Discovery of Other Homicide Investigation Files

Brinkley contends that the trial court erroneously restricted his discovery of information in the State's custody that he believes may have helped his defense. Before trial, Brinkley filed discovery motions seeking access to investigation files concerning the unsolved alleged murders of Randy Leach and Lloyd Folsom. Brinkley based his request on Montgomery's testimony at the preliminary hearing. Montgomery admitted that a Kansas Bureau of Investigation (K.B.I.) agent told him he was a suspect in two other murders, one of them being the Lloyd Folsom murder. Brinkley sought to examine the Folsom and Leach investigation files with the hope of finding evidence that Montgomery and Bishop were involved together in the Leach and Folsom murders. Brinkley reasoned he could argue that Montgomery had the greater motive to kill Bishop, *i.e.*, to keep Bishop from implicating him in the murders of Leach and Folsom.

The relevant portion of the discovery statute, K.S.A. 22-3212, provides:

"(2) Upon request, the prosecuting attorney shall permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which are or have been within the

possession, custody or control of the prosecution, and which are material to the case and will not place an unreasonable burden upon the prosecution."

Discovery in criminal cases favors disclosure "as full and complete as is reasonably possible under the circumstances." *State v. Humphrey*, 217 Kan. 352, 356, 537 P.2d 155 (1975).

"K.S.A. 22-3212 allows the trial court broad discretion to require disclosure of documents and other tangible objects which may be in the possession of or under the control of the prosecution. The defendant has the burden of showing the materiality and reasonableness of the request." *State v. Dykes*, 252 Kan. 556, 559, 847 P.2d 1214 (1993).

The State suggests Brinkley's discovery request placed an unreasonable burden on the prosecution because the files requested "involved unsolved homicides" and were "the subject of ongoing investigation[s]." The State also contends that Brinkley failed to meet his burden of showing that the files were material to his case. The trial court conducted an in camera review of the records to determine whether they contained any relevant material, and concluded that they did not. The trial judge said:

"[I] [t]ook [the request] under advisement so I could review materials provided by the K.B.I. on this case and on the Folsom case, also on the Leach case. I reviewed those materials, and I have them under seal, so they will be available for the Court of Appeals or actually the Supreme Court in this case. I do not find anything in those materials that is relevant or material to this case. I reviewed your motion, and, that is, the standard set by the Court of Appeals, the Supreme Court, is that all matters discoverable which are relevant and material. There is nothing in those materials, in my opinion, which would be exculpatory to Mr. Brinkley or assist in any impeachment of the witnesses in this case."

Brinkley's motion to compel discovery of the Leach and Folsom files was denied. The files were placed under seal for purposes of our review.

Brinkley does not contend that the trial court abused its discretion, but requests that we examine the files and decide whether they contain any information that might be exculpatory or might have materially helped Brinkley in his defense. The files consist of four large envelopes of loose papers. There is no index, no table of contents, and no readily apparent organization to the files. Besides notations on certain pages, it is difficult to tell which

papers correspond with which investigation—Folsom or Leach, or both.

We have reviewed the files. We find no reversible error in the trial court's ruling.

## Alleged *Doyle* Violation

Brinkley was arrested and incarcerated in Florida on grand theft charges. He was later charged in North Carolina with federal weapons violations. Kansas authorities in October 1990 tried to interview Brinkley concerning the Bishop murder, but on the advice of counsel Brinkley would not discuss the matter. He eventually gave a statement to Kansas authorities implicating Montgomery after a complaint had been filed against him for Bishop's murder, alleging that he was the killer.

Brinkley contends that the State improperly introduced evidence of his post-arrest silence for purposes of impeachment, violating *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). The State argues that counsel for Brinkley opened the door and that Brinkley did not object and therefore cannot assert a challenge on appeal. Brinkley concedes that he did not object. In *State v. Fisher*, 222 Kan. 76, 83-84, 563 P.2d 1012 (1977), we refused to consider Fisher's *Doyle* contention because he had not made a timely objection to the evidence at trial. See K.S.A. 60-404.

We observe that in direct examination, defense counsel brought up Brinkley's silence in the October 1990 meeting with Agent Delaney. Again, in closing argument, it was defense counsel who highlighted Brinkley's silence as an apparent attempt to bolster Brinkley's credibility. The State made no reference or argument concerning Brinkley's October 1990 silence during its closing argument. *Doyle* violations occur when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself of the first opportunity to clear his or her name when confronted by police officers, but instead remained silent (in the exercise of a constitutional right).

Brinkley does not attempt to compare the State's comments in the instant case to any other cases in which a *Doyle* violation was

found. He does cite *State v. Higgins*, 243 Kan. 48, 755 P.2d 12 (1988). In *Higgins*, the prosecutor questioned a detective "in detail about the defendant's refusal to talk with [him] after the arrest" and then committed an even more egregious *Doyle* violation in closing argument. 243 Kan. at 50. In holding that the State had violated Higgins' right to due process, we said that "[t]he sole motivation for the State's comments was the exploitation of the opportunity to utilize defendant's exercise of his Fifth Amendment *Miranda* rights against him." 243 Kan. at 51-52. In contrast, in Brinkley's case, the State's motivation for inquiring at some length about the visit with Agent Delaney in October 1990 was to respond to an argument by the defense which attempted to use Brinkley's exercise of his *Miranda* rights in his favor. Failure to comply with the contemporaneous objection rule imposed by K.S.A. 60-404 bars defendant's challenge on appeal to the introduction of evidence of his post-arrest silence. We rely on *Fisher* in disposing of Brinkley's *Doyle* claim, but we also find the claim lacks merit.

## The Habitual Criminal Act

Brinkley reasons that his prior conviction for attempted bank robbery should not have constituted a predicate offense for invoking the HCA, K.S.A. 1989 Supp. 21-4504(a) (now 1993 Supp.). We agree. All attempts are article 33 crimes. See K.S.A. 21-3301 and amendments thereto. The application of K.S.A. 1989 Supp. 21-4504(a) (now 1993 Supp.) is limited to defendants previously convicted of a felony specified in article 34, 35, or 36.

The district court sentenced Brinkley to two consecutive life terms of imprisonment. The State contends: (1) There is no such crime as an "attempt," standing alone, and (2) all attempts must be tied to another crime; consequently, the underlying crime determines whether a conviction for an attempt falls within the HCA.

This issue is controlled by the rationale of *State v. Smith*, 232 Kan. 284, 654 P.2d 929 (1982). In *Smith*, we held that attempted aggravated robbery was not an article 34 crime under K.S.A. 21-4618, the firearm statute. K.S.A. 21-4618 applied only to article

34 crimes. Attempts are defined by article 33. Smith's sentence was modified to remove any reference to K.S.A. 21-4618. 232 Kan. at 286. We remand the instant case for resentencing. Brinkley's conviction of attempted bank robbery may not be used to increase his sentence under the HCA.

## Instructing Jury on Aiding and Abetting

Brinkley alleges error in instructing the jury that it could find Brinkley guilty of aiding and abetting in the Bishop murder. The State did not charge Brinkley with aiding and abetting and did not pursue that theory at trial. According to Brinkley, the aiding and abetting instruction came as an unfair surprise and violated his due process rights. He concedes, however, that "in Kansas, a defendant charged with the substantive offense may still be convicted of aiding and abetting and that the trial court does not err in instructing on aiding and abetting when the State has presented sufficient evidence for the jury to find aiding and abetting," citing *State v. Smolin*, 221 Kan. 149, 152, 557 P.2d 1241 (1976). Brinkley does not explain why *Smolin* should not apply to his case. He simply states that he "intends to preserve this issue."

The State argues that the "totality of the evidence" at trial warranted the aiding and abetting instruction, noting that "[t]he evidence presented by the defendant attempted to show that Mr. Montgomery killed the victim and the defendant only assisted Mr. Montgomery to some degree."

Brinkley's contention is similar to one recently rejected in *State v. Green*, 254 Kan. 669, 686-87, 867 P.2d 366 (1994).

Brinkley made a timely objection to the aiding and abetting instruction, referring the trial court to a memorandum prepared by counsel. The trial court overruled the objection, saying that the aiding and abetting instruction "does apply to the facts in this case."

In closing arguments, the State mentioned the aiding and abetting instruction only briefly; the State did not switch to an aiding and abetting theory. In reference to the aiding and abetting instruction, the State said:

"The Judge also instructed you as to the issue of the principle of legal liability in the State of Kansas, and what is referred to as aiding and abetting. And what

that means is two people intentionally participated in a crime, in the commission of a crime. They are both equally guilty of that crime."

The State made no further mention of the aiding and abetting instruction or that theory of the case. In summation, unlike in *Green* where the prosecutor hedged and said that Cortez was perhaps merely "involved" in the killing (after going through trial on the theory that he was the killer), the State made no reference to the possibility of aiding and abetting liability, but urged the jury to conclude that Brinkley was the killer.

This issue is controlled by *Green*, which held under similar circumstances that giving an aiding and abetting instruction is not error if there is sufficient evidence to support the instruction, even though the only evidence supporting the aiding and abetting theory was circumstantial. The three men participated together in ongoing criminal activity, Bishop became nervous about it, Montgomery and Brinkley went together to Bishop's house, Bishop was killed in the presence of both, and his body was concealed by both men. From these facts, a jury could reasonably infer that Montgomery and Brinkley were in the murder together, although both of them denied personal responsibility at trial. We conclude that instructing the jury on aiding and abetting was not error under the facts of this case.

### Brinkley's Pro Se Contentions

Brinkley makes eight additional arguments in a pro se supplemental brief. He contends that: (1) evidence was admitted beyond the scope of the charges against him; (2) evidence of his other crimes was improperly admitted; (3) there was insufficient evidence to support the conviction; (4) the State was erroneously permitted to define "reasonable doubt" in argument; (5) the trial court committed error where a witness was permitted to retake the stand after having been dismissed by both sides; (6) his motion to change venue should have been granted; (7) his court-appointed defense counsel should have been permitted to withdraw; and (8) his trial counsel was constitutionally ineffective. We have reviewed the record with a concurrent review of his contentions.

The only one of Brinkley's eight contentions that was presented in some fashion to the trial court is his second contention, that

evidence of his other crimes was improperly admitted at trial. Brinkley's counsel included this argument in a motion for new trial, but did not object during trial when such evidence was admitted. A motion for new trial generally does not satisfy the contemporaneous objection requirement of K.S.A. 60-404. Thus, unless defense counsel objected to the introduction of evidence concerning Brinkley's prior convictions when such evidence was introduced, it is not properly considered on appeal.

The remainder of Brinkley's contentions either are not properly raised on appeal because the issue was never presented to the trial court (insufficient evidence; witness permitted to retake the stand; ineffective assistance of counsel; withdrawal of counsel) or they have no factual bases in the record to which we have been directed. We find no merit in the pro se contentions.

The conviction is affirmed. The defendant's sentence is vacated, and the case is remanded for resentencing.