NOT DESIGNATED FOR PUBLICATION

No. 111,353

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEAN HURT, as Administratrix of the Estate of Barry L. Venters,
*Appellant*,

v.

SCOTT E. SELLERS, D.O.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed January 15, 2016. Affirmed.

*Matthew E. Birch, Daniel A. Singer,* and *Richard L. Budden*, of Shamberg, Johnson & Bergman, Chtd., of Kansas City, Missouri, for appellant.

*Tracy A. Cole*, of Gilliland & Hayes, LLC, of Hutchinson, for appellee.

Before MALONE, C.J., HILL and STANDRIDGE, JJ.

*Per Curiam*:  After a night of drinking, Barry Venters was in a violent car crash ending up outside the vehicle on the ground when it came to rest. His driver was intoxicated and had driven the car in a dangerous manner. Eventually, Dr. Scott Sellers treated Venters, who was noticeably uncooperative, in the emergency department of the hospital. Venters left the hospital paralyzed from the chest down. Venters died in 2010.

Venters' estate sued Dr. Sellers, claiming his negligent treatment caused Venters' paralysis. The jury rendered a verdict assessing Venters' fault as 43 percent and Dr.

1

Sellers at 6 percent, and the remaining fault with the driver of the car. This verdict resulted in a judgment for Dr. Sellers.

Seeking reversal and a new trial, the Estate now claims the trial court improperly admitted evidence of the negligence of the driver of the car in which Venters was riding. Because the Estate failed to object to the admission of the evidence at trial, we hold it has not preserved that issue for appellate review.

The Estate also claims the trial court erred when it allowed the jury to compare the driver's negligence as well as that of Venters' and Dr. Sellers when it made its determination of fault. Under our system of comparative negligence, it is up to the jury to decide the percentage of negligence attributable to each party. We hold that it was reasonable for the trial court to allow the jury to decide if the driver's negligence caused or contributed to Venters' injuries. Finding no error, we affirm.

*Drinking and driving ends with a trip to the hospital.*

On the evening of January 8, 2001, Venters, Kyle Shive, and Norman Wilson were at a steakhouse drinking alcohol at a friend's birthday party. Intoxicated, they left the steakhouse at around 2 a.m., with Shive intending to drive Venters and Wilson home. While driving along the back roads, Shive lost control of the car, causing it to leave the road onto a field and roll over. Shive helped Wilson out of the back seat and they found Venters on the ground outside of the vehicle. Venters told Shive his back hurt. Shive gave Venters his jacket and left on foot to get help.

Officers Jesse Downard and John Culley responded. Downard finally located the accident scene by following tracks in the dirt road showing evidence of the car sliding around corners and fishtailing. Once they were at the scene, Officer Downard saw Venters lying directly by the wrecked vehicle. When Officer Downard tried to talk to

2

Venters, he appeared to be "fairly intoxicated" and told Officer Downard to go away and leave him alone. Officer Downard asked for emergency medical services help.

When Elwin Gingerich, Chief of the Haven volunteer fire department, responded to the accident scene, he saw Venters lying beside the wrecked vehicle on his side in a crouched position trying to keep warm. When Gingerich asked Venters how he was, Venters replied he was drunk and just wanted to go to sleep and to be left alone. Upon hearing this, Gingerich went to get help from Venters' brother, Billy Venters, who was at the accident scene as a volunteer with the fire department.

Emergency medical technicians had also arrived at the accident scene. EMT Tony Troyer saw Venters lying on his side about 15-20 feet from the vehicle. Venters told Troyer that he was fine, that he had no neck or back pain, and refused treatment or transportation to the hospital after being advised by Troyer that he needed to go to the hospital. Since Venters refused treatment or transport, he was advised to sit up to see if he still felt fine. If Venters still felt the same about his injuries after sitting up, the EMTs intended to ask Venters to sign refusal paperwork. The EMTs assisted Venters in sitting up by extending an arm. After Venters sat up, he complained for the first time that his neck hurt. Upon hearing this complaint, Troyer physically immobilized Venters' head. Troyer continued to try to talk Venters into going to the hospital, but Venters kept refusing. Troyer asked Billy to talk Venters into going to the hospital.

For his part, when called over to talk with Venters, Billy asked him if he was okay. Venters said he was sore and pointed to his right shoulder. He did not say he had neck pain. Venters did not think he had been ejected from the car and told Billy he wanted to go home several times. Billy talked with Venters for a while and finally convinced him to get examined. At that point, the EMTs put the cervical-collar on Venters and transported him to the Hutchinson hospital.

3

*Several people at the hospital treated Venters.*

Nurse Tonya Michael performed the triage assessment of Venters in the emergency department upon his arrival and acted as his primary care nurse. She noted that Venters arrived immobilized on the spine board with a cervical collar. Venters reported having neck pain. One of the EMTs reported to Michael that when the ambulance had been at the accident scene, Venters had been upright. From the outset, Michael realized that Venters did not want to be at the hospital from the way he was acting. Michael saw Venters moving around trying to remove the immobilizer and c-collar. Michael explained to Venters this was for his own good and asked Venters to stay still, let them do their assessment, and take care of him. Venters repeatedly stated he wanted to leave. Venters was angry when responding to Michael's questions about the accident and remained belligerent throughout the remainder of Michael's shift. By 6:30 a.m., Michael observed that Venters was still in the c-collar and his neck had not been cleared.

Dr. Sellers examined and assessed Venters' injuries in the emergency department. Venters was uncooperative. Dr. Sellers saw Venters bucking on the spine board by arching his back using his shoulders or head as a lever. Dr. Sellers advised Venters he needed to stop and explained why. In response, Venters stopped moving around, but remained belligerent. Dr. Sellers understood Venters had been in an accident since he had various contusions and abrasions. With reported neck pain, Dr. Sellers assumed Venters' neck was unstable and worked to clear the neck. Until then, Dr. Sellers planned to keep Venters immobilized.

Around 4 a.m., Dr. Sellers sent Venters for x-rays of his cervical spine while on the spine board and while wearing the c-collar with wedges on both sides of his neck. After the first set of x-rays, Dr. Sellers could only see to the top of the spine at C6. Dr. Sellers discussed this with x-ray technician Susan Anger and they planned to try again

4

later. Dr. Sellers went back to see Venters and told him that he was not able to visualize the base of his neck on the x-rays. Dr. Sellers opened the c-collar, palpated the back of Venters' neck while he lay down, and refastened the c-collar. Dr. Sellers ordered shoulder x-rays. While Venters was in x-ray, Anger was expected to retry for a "swimmers view" of C6-C7.

When Anger tried to get a lateral view of Venters' neck in the initial x-ray, Venters would not stay still. The initial lateral view x-ray only produced a good image from C1-C4, not C5-C7. Venters would not cooperate with Anger's attempts to obtain a swimmer's view x-ray. The shoulder x-rays and repeat x-rays were attempted just after 6 a.m. Anger was still unable to get a swimmer's view x-ray because Venters would not cooperate, hold still, and do what Anger asked. Venters was returned to his room just before 6:30 a.m.

Treva Bussard, a certified nursing assistant, was responsible for taking Venters' vital signs. Bussard testified that at some point between the cervical spine x-rays and shoulder x-rays she tried to make Venters more comfortable by moving him onto his side using a turn sheet when he did not have the c-collar on. Bussard stated that Venters became more comfortable after being turned on his side and he stayed on his side for a while. Bussard later moved Venters off his side because "he wasn't comfortable and he was yelling."

At around 6 a.m., Jean Hurt, Venters' mother, arrived at the hospital. Hurt saw Venters complaining of pain and "thrashing his legs around on the bed." Hurt also saw a nurse roll Venters, not completely on his side, at his request.

*The parties hotly dispute what happened next.*

Dr. Sellers testified that Venters was not helping himself by not allowing Anger to get the swimmer's view x-ray. After Venters repeatedly asked when he could go home,

5

Dr. Sellers, "out of frustration," told Venters, "When you can get up and walk out of here, I will let you go."

In response, Venters put each hand on the bed rail and started to sit up. Dr. Sellers did not want Venters to get up but did not stop him. Instead of risking making things worse by pushing Venters back down, Dr. Sellers decided to immediately stabilize Venters' neck behind the c-collar to see what Venters could do. Venters said he could not do it, and Dr. Sellers let Venters back down. Venters complained that he hurt all over. Dr. Sellers then discussed the need to admit Venters to the hospital and left to make arrangements.

In contrast, CNA Bussard testified that at around 6:45 a.m. she was in Venters' room when Dr. Sellers told Venters "that if he could get up . . . he would let him leave. That all of his x-rays were almost cleared." According to Bussard, Dr. Sellers asked her to "help assist" him in sitting Venters up, with Dr. Sellers taking Venters' upper body and Bussard taking his lower body. Venters did not have his c-collar on and they sat Venters up only so far until Venters started yelling to lay him back down. Bussard helped Dr. Sellers lay Venters back down. Dr. Sellers then put the c-collar back on Venters. Bussard denied raising the head of the bed before leaving.

Hurt was also present in Venters' room. She recalled Dr. Sellers telling Venters, "if he could set up he could go home." Hurt stated she saw Dr. Sellers and Bussard try to sit Venters up by swinging his legs over the cart and raising his head. According to Hurt, they laid Venters back down because he was in terrible pain.

At 7 a.m., CNA Pam Jantz informed the day-shift nurse who had taken over Venters' care, Donna Orpin, that there had been a change in Venters' vital signs. When Orpin went in Venters' room, she noted that Venters had his c-collar on and the head of his bed had been raised approximately 20 degrees. Venters told Orpin he was hurting all

6

over and despite his legs being straight asked Orpin to straighten his legs. Orpin conducted a neurological assessment. She discovered that Venters was unable to feel any palpation or touch in his lower extremities but had gross motor control of his arms. A rectal assessment at 7:20 a.m. revealed Venters was unable to feel sensation. Venters only had sensation down to his nipple-line. Ultimately, Venters was transferred to Via Christi Hospital St. Francis in Wichita.

At 4:15 p.m., neurosurgeon Raymond Grundmeyer examined Venters. Dr. Grundmeyer determined Venters had suffered a complete spinal cord injury of the C-6, or "bilateral locked facets." After a failed attempt at traction to take pressure off the spinal cord and try to stabilize Venters' spine, Dr. Grundmeyer separated the vertebrae surgically. The operation stabilized Venters' spine, but left Venters with no expectation of restored neurological functions.

*Venters takes legal action.*

In June 2002, Venters filed a lawsuit against both Dr. Sellers and Hutchinson Hospital Corporation. Venters died intestate in 2010 and his estate was substituted as the party plaintiff. The hospital was dismissed as a party, leaving Dr. Sellers as the remaining defendant.

In September 2013, the district court heard arguments on the Estate's fourth motion in limine. It sought to exclude any evidence of Shive's intoxication or conduct before and after the accident. The dispute at the hearing centered on whether the Estate's admission that Shive was negligent made the evidence of Shive's intoxication or conduct irrelevant to the question of causation. The district court ruled that the Estate did not have the right to stipulate to the negligence of a party not named in the action. The district court stated, "there will still be questions of relevancy, and I will deal with those at the

7

time, but I believe the comparative fault statute in Kansas allows that testimony at this juncture in this case given the status of the parties."

At the jury trial, the Estate sought recovery from Dr. Sellers for permanent injury. It asserted that Dr. Sellers' negligence caused Venters to sustain permanent injury by failing to keep Venters flat until his neck was cleared, by not ordering a CT scan, and by telling Venters "he could go home when . . . Venters could get up and walk out of the hospital."

Dr. Sellers took the position that Venters received his injuries from the car accident. Dr. Sellers alleged Shive was at fault for Venters' injuries due to Shive negligently driving while under the influence of alcohol, and Venters was at fault for failing to follow instructions of health care providers and to cooperate in his care.

*Experts offer the jury different opinions.*

Both parties presented expert testimony supporting their theories. The Estate offered testimony from Dr. Grundmeyer and Dr. Alfred Frankel, an emergency room physician in Florida. In opposition, Dr. Sellers offered the testimony of Dr. Paul Harrison, a critical care surgeon consultant in Wichita; Dr. Paul Arnold, a neurosurgeon at the University of Kansas School of Medicine; and Dr. Marcus Bassett, an emergency physician at Stormont-Vail Hospital in Topeka.

Dr. Grundmeyer testified that Venters had perched facets when he arrived at the hospital. Dr. Grundmeyer described the action necessary to produce bilateral locked facets as a severe flexion injury, usually a compression of the head, where the flexion is so severe that it pulls the joint apart and tears the capsule of the joint. Dr. Grundmeyer ruled out the possibility that Venters had suffered the bilateral locked facets before arriving at the hospital given that Venters' neurological decline from the time of the

8

accident until approximately 6:30 to 7 a.m. thoroughly contradicted the theory that he had suffered bilateral locked facets during the vehicle accident. Dr. Grundmeyer was asked whether the "sitting up event" while Venters was not wearing a collar caused the bilateral locked facets. Dr. Grundmeyer responded, "So to the timing of the event and no other physical activity, then that would be consistent with causing his injury." Dr. Grundmeyer opined that the only event that would be consistent with Venters' loss of neurological function or the perched facets becoming locked facets was Venters sitting up.

Dr. Grundmeyer testified that Dr. Sellers' treatment of Venters by allowing him to sit up before his neck was cleared fell below the medical standard of care. Dr. Grundmeyer, however, conceded that "any amount of movement" could cause perched facets to become locked, and it was possible for a patient with bilateral locked facets to have a delayed loss of neurological function.

Dr. Frankel also testified that Dr. Sellers' failure to keep Venters immobilized and clear his neck fell below the standard of care. Dr. Frankel agreed that the proper standard of care required Venters to remain supine until his neck was cleared. Dr. Frankel opined it was inappropriate for Dr. Sellers to allow or help Venters to sit up, and Dr. Sellers should have ordered a CT scan. Dr. Frankel testified that the event that caused Venters' loss of neurological function was when Dr. Sellers and CNA Bussard "sat [Venters] up or tried to sit him up." Dr. Frankel was also critical of Venters being turned onto his side when taken off the spine board and expressed concern with Venters being turned on his side without assistance by Bussard.

Dr. Sellers presented testimony from Drs. Harrison and Arnold. They both testified it was the accident that caused Venters' injuries. Dr. Harrison testified that Venters had bilateral locked facets at the accident scene and had a delayed loss of neurological function. Dr. Harrison testified that Dr. Sellers met the standard of care in caring for Venters. Dr. Harrison agreed it was reasonable for Dr. Sellers not to sedate or

9

restrain Venters, that a physician has to rely on a patient to comply with instructions, and Venters was competent to make his own decisions. Dr. Harrison also agreed that it was reasonable for Dr. Sellers to stabilize Venters' spine when he attempted to sit up rather than restraining Venters.

Dr. Arnold disagreed with Dr. Grundmeyer's opinion that Venters had perched facets that became locked while at the hospital because there was no evidence after the accident of the amount of force that would be needed to cause facets to be locked to the extent they could not be moved with traction. When discussing the disputed versions of what occurred when Venters attempted to sit up, Dr. Arnold opined it was "extremely unlikely" either version would have provided the needed movement or force to cause bilateral locked facets.

Additionally, Dr. Bassett testified that Dr. Sellers met the standard of care in treating Venters. Dr. Bassett stated it was reasonable for Dr. Sellers to respond to Venters' inquiry as to what he had to do to get out of the hospital and to place his hand behind Venters' c-collar to stabilize him rather than restraining Venters from moving when Venters attempted to sit up. When asked if he had an opinion as to testimony that Venters may have been turned on his side, Dr. Bassett opined that all emergency department personnel must know that any patient with a c-collar or immobilized should not be moved without the attending doctor's order.

The jury returned a verdict finding Venters 51 percent at fault, Shive 43 percent at fault, and Dr. Sellers 6 percent at fault. Based on that verdict, the district court entered judgment in favor of Dr. Sellers.

To us, the Estate argues that the district court's failure to exclude evidence of Shive's intoxication or conduct prior to and after the accident is reversible error. The Estate argues that such evidence was not relevant to the causation element of Shive's

10

comparative fault given that Venters offered to admit Shive was negligent. Additionally, the Estate argues that the district court should not have instructed the jury on the duties of a patient when making their comparative fault determination.

*The issue concerning the admission of evidence of Shive's condition or conduct has not been preserved for appellate review.*

The Estate's issue relates primarily to whether the evidence was relevant. Specifically, the Estate argues that the district court erred in finding that evidence of Shive's intoxication or conduct was relevant to show causation since the Estate had conceded that Shive was negligent.

Indeed, the Estate asserts that where comparative negligence is an issue under K.S.A. 60-258a there is a "legally separable" distinction between the elements that must be proved to show fault. In other words, Dr. Sellers had to prove both negligence and causation. Therefore, in the Estate's view, the district court should have ruled that the Estate's offered admission of negligence left only the issue of causation for trial. The Estate claims that it was, therefore, legal error for the district court to find that the evidence of Shive's intoxication or conduct was relevant for the jury's determination of fault.

Since this is a question of admission of evidence, we first must address Dr. Sellers' argument that the Estate's failure during trial to contemporaneously object to the admission of the evidence of Shive's intoxication or conduct is fatal to this appellate claim.

Kansas caselaw is clear. When the district court denies a motion in limine and that evidence is later introduced at trial, the moving party must object at trial to the admission of the evidence to preserve the issue for appeal. *Unruh v. Purina Mills*, 289 Kan. 1185,

11

1193, 221 P.3d 1130 (2009). In *Douglas v. Lombardino*, 236 Kan. 471, Syl. ¶ 2, 693 P.2d 1138 (1985), the court held that the failure of medical malpractice plaintiffs to object to the reading of an opinion portion of a pathologist's autopsy report constituted waiver of any objection plaintiffs had to the district court's denial of a motion in limine. Thus, here, the Estate needed to object to the admission of this evidence. Moreover, the statute makes it clear that "[a] verdict . . . . shall not be set aside . . . by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A 60-404.

In our view, the Estate has waived this issue. After the district court denied the fourth motion in limine, the Estate failed to object when Dr. Sellers introduced evidence at trial of Shive's intoxication and conduct. We see no attempt in the record to satisfy the contemporaneous objection rule by requesting a continuing objection to the admission of this evidence either before trial or at the outset of trial. See *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 471, 124 P.3d 57 (2005). Moreover, the Estate's motion for a new trial did not satisfy the contemporaneous objection requirement. Compare with *State v. Brinkley*, 256 Kan. 808, 824, 888 P.2d 819 (1995).

In fact, the Estate admits in its reply brief that it did not contemporaneously object to the evidence in question. Instead, it gives two reasons why the contemporaneous objection rule is not applicable here.

First, the Estate tries to reframe this issue into a question of law, not an evidentiary challenge. The Estate now claims that a contemporaneous objection was not required to preserve this issue because it is not appealing the erroneous admission of evidence. Instead, it is limiting its argument on appeal to the district court's legal conclusion rejecting the basis Venters presented to the district court to exclude the evidence of

12

Shive's intoxication or conduct as not being relevant, in light of the Estate's admission of Shive's negligence.

This argument in the Estate's reply brief is a direct contradiction to not only its request in the fourth motion in limine, but also its own final summation in its brief, where the Estate contends, "the trial court erred in admitting evidence of Shive's intoxication." This is an attempt to do an end-run around the contemporaneous objection rule.

The Estate is essentially arguing that as long as the moving party frames the argument on appeal to be a challenge to the district court's interpretation of the legal principle that resulted in the denial of its motion in limine, then somehow the moving party is not challenging the erroneous admission of the evidence itself. Such an illogical argument, if allowed, would eviscerate the contemporaneous objection rule. The Estate sought the exclusion of the evidence before trial. It failed. Therefore, it was incumbent upon the Estate to object at trial, thus giving the trial court an opportunity to correct any error it might have made in its pretrial ruling. Trial judges can change their minds and exclude evidence at trial despite ruling otherwise before trial.

Next, the Estate argues that we need not address Dr. Sellers' contemporaneous objection argument because Dr. Sellers did not raise this argument before the district court when responding to the Estate's motion for a new trial. In an attempt to turn the tables, the Estate claims that Dr. Sellers failed to preserve his argument and, thus, cannot raise it for the first time on appeal.

We are not so persuaded. Essentially, the Estate is arguing that this court's determination whether a moving party met its obligation to follow the contemporaneous objection rule is contingent upon the opposing party filing a posttrial motion asking the district court to make such a determination first. That is tantamount to saying the burden of following the contemporaneous objection rule is upon the party seeking the admission

13

of the evidence and not the party seeking its exclusion. We will not rule that Dr. Sellers was barred from raising the point since he did not make the argument to the district court.

More importantly, the obligation to preserve an issue relating to the pretrial erroneous suppression or admission of evidence for appeal clearly rests with the moving party. *Unruh*, 289 Kan. at 1193. This court's determination whether the moving party has failed to preserve a suppression or admission issue by not making a contemporaneous objection at trial is a procedural holding, not unlike the question of jurisdiction, to assure the moving party has the right on appeal to complain about the suppression or admission of that evidence. In addition, whether or not the opposing party brings the contemporaneous objection rule to our attention, either in the record before the district court or on appeal, is irrelevant to our determination whether there is a procedural bar to the moving party obtaining relief on appeal for such an issue.

Because the Estate failed to object to the admission of the evidence it sought to exclude at trial, it cannot now argue the district court erred in denying its motion in limine. See *Unruh*, 289 Kan. at 1193.

We turn now to the second issue.

*The court did not err when it instructed the jury on Venters' duty as a patient.*

The Estate argues the district court had no good reason to instruct the jury on the duties of a patient in order for it to make a comparative fault determination. Conversely, Dr. Sellers maintains that there was sufficient evidence to instruct the jury on Venters' duty as a patient to support the Estate's defense that Venters' negligence at the hospital caused his increased injury or paralysis.

Usually, it takes several steps to make this analysis. First, we exercise unlimited review over questions of appellate jurisdiction and issue preservation. Second, we have unlimited review to determine whether the instruction was legally appropriate. Third, if we find the instruction was legally appropriate, we look to the record in the light most favorable to the party that requests the instruction to determine whether sufficient evidence supported giving the instruction. Finally, if the district court erred, we determine whether the error was harmless. *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

The Estate has preserved this claim of error for appellate review. A party preserves for appellate review a claim that the district court erred by giving an instruction by timely objecting at trial and by stating the grounds for the objection. See K.S.A. 2013 Supp. 60-251(c)(1), (c)(2)(A), and (d)(1)(A). When the district court discussed the jury instructions with the parties, the Estate objected to the district court's decision to give Dr. Sellers' proposed jury instructions on the duties of a patient (Instruction No. 11), comparative fault theory (Instruction No. 12), and explaining how to assign comparative fault on the verdict form (Instruction No. 14).

*The comparative fault instruction was legally appropriate.*

Next, our inquiry turns to whether it was legally appropriate for the district court to instruct the jury on the comparative fault of Venters. See *Foster*, 296 Kan. at 301. The district court is required to give an instruction supporting a party's theory of the case if there is sufficient evidence supporting the theory. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010).

Generally, a patient has a duty to follow reasonable instructions and advice from a health care provider. See *Cox v. Lesko*, 263 Kan. 805, 819-20, 953 P.2d 1033 (1998).

Kansas courts have allowed a comparison of fault between the health care provider and the patient when the patient fails to follow the health care provider's instructions and the patient's actions caused or contributed to the patient's injury. See *Cox*, 263 Kan. at 819; *Wisker v. Hart*, 244 Kan. 36, 40-41, 766 P.2d 168 (1988). A health care provider, as a defense to negligent treatment in a medical malpractice claim, cannot introduce evidence that the patient may have been at fault in causing the original injury triggering the patient's need for medical treatment unless the conduct is a legal or proximate cause of the injury. *Huffman v. Thomas*, 26 Kan. App. 2d 685, 689-91, 994 P.2d 1072, *rev. denied* 268 Kan. 886 (1999).

Thus, under these circumstances, Dr. Sellers can introduce evidence that Venters' failure to follow instructions or advice at the hospital impaired Dr. Seller's ability to treat Venters' neck injury or affected Venter's neck injury; or, the failure affected Venters' neck injury in some way. In other words, were Venters' actions a causal factor in his injury?

Indeed, the three jury instructions at issue correctly stated the law. First, in Instruction No. 11, the district court explained the duties of a patient by following PIK Civ. 4th 123.20. Instruction No. 12 mirrored the PIK instruction for explaining comparative fault in PIK Civ. 4th 105.01. It defines the terms "negligence" and "fault." Instruction No. 14 followed PIK Civ. 4th 105.03 and designated Venters, Shive, and Dr. Sellers as the individuals to whom fault could be assigned. It also stated that Venters was the party who may be found to have received damages.

Because the Estate does not dispute that the instructions directing the jury to compare the fault of Venters and Dr. Sellers were an accurate statement of the applicable law, we need not address this second step of the inquiry. An issue not briefed by the appellant is deemed waived and abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Instead, the Estate limits its arguments to the third

16

and fourth steps of the inquiry: sufficiency of the evidence to support the instruction and harmless error.

*Evidence supported instructing the jury on Venters' fault.*

For the third step of our inquiry, we must determine whether sufficient evidence supported comparing the fault of Venters to the others. See *Foster*, 296 Kan. at 301. In this context, there must be evidence supporting Dr. Sellers' comparative fault theory which, if accepted as true and viewed in the light most favorable to Dr. Sellers, is sufficient for reasonable minds to reach different conclusions based on the evidence. See *Puckett,* 290 Kan. at 419. Thus, if reasonable people could disagree over whether Venters was negligent in accepting reasonable treatment and following the advice he received as a patient based on the evidence presented at trial, then the district court should have instructed the jury to compare his relative fault.

Indeed, both parties agree that for Dr. Sellers to compare the fault of Venters, Dr. Sellers had to present evidence establishing Venters was negligent regarding his duties as a patient and Venters' negligence caused or contributed to his injury. See *Haley v. Brown*, 36 Kan. App. 2d 432, 437, 140 P.3d 1051 (2006).

The Estate argues Dr. Sellers cannot show causation because there was no evidence that any specific action by Venters, including him "voluntarily sitting up," caused his injury; thus, Dr. Sellers did not establish causation through expert testimony. Granted, unless the common knowledge or experience exception applies, which neither party asserts, medical malpractice actions ordinarily require expert testimony to establish the accepted standard of care required of physicians and to prove causation. See *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). However, the Estate cannot have it both ways regarding causation.

17

The Estate obscures the point. Venters sitting up was the Estate's claimed mechanism of injury. The Estate's theory of Dr. Sellers' negligence relied solely on the contention that the permanent injury to the spinal cord, or perched facets becoming locked, occurred when Dr. Sellers attempted to sit Venters up. In order to recover as the injured party, the Estate had to show a causal connection between the alleged duty breached by Dr. Sellers, the alleged inappropriate statement, and the injury received. See *Cox*, 263 Kan. at 818. In other words, the Estate had to prove causation by producing expert testimony that Venters' act of sitting up caused his permanent injury.

This is the very act the Estate argues on appeal cannot support Dr. Seller's comparative fault theory. See *Bacon,* 243 Kan. at 307. Assuming that the Estate's theory of the case is correct, the same event—sitting up—supports the causation element of fault for Dr. Sellers' comparative fault theory. That is to say, while the injury to Venters' spinal cord occurred during the accident, Venters' conduct as a patient caused or contributed to the symptomatic onset of the damage to the spinal cord over time.

Clearly, both Dr. Grundmeyer and Dr. Frankel testified that the event that caused Venters' loss of neurological function was Venters sitting up. Thus, the dispositive question centers on the disputed testimony of Dr. Sellers, Bussard, and Hurt over Venters' reaction to Dr. Sellers' statement, or Dr. Sellers' actions when making that statement. However, we cannot and will not reweigh that evidence. That is for the jury to decide.

Our question is whether there was sufficient evidence for a reasonable juror to conclude Venters acted negligently in heeding the instruction of Dr. Sellers or failed to cooperate in his care. Jury Instruction No. 12 explained the definition of negligence for the jury as follows: "Negligence is the lack of reasonable care. It is the failure of a person to do something that a reasonable person would do, or it is doing something that a reasonable person would not do, under the same circumstances." See PIK Civ. 4th 105.01.

18

There was ample evidence that Venters was physically not cooperating in his care and seemed more concerned with leaving the hospital than having his neck cleared. Venters was made aware prior to 6:30 a.m. that he should not move around pending his neck being cleared. Yet there was evidence presented that Venters had prompted a move onto his side while he did not have his c-collar on. Dr. Grundmeyer testified that "any amount of movement" could cause perched facets to become locked, and Dr. Frankel expressed concern with Bussard turning Venters on his side.

Dr. Sellers also testified that his statement to Venters was not intended to be construed literally as a direction for Venters to try to get up. Such evidence, when viewed in the light most favorable to Dr. Sellers, which we are required by law to do, supports a jury conclusion that a reasonable patient under the same circumstances would not try to sit up upon hearing Dr. Sellers' statement.

When considering the entire record on appeal, sufficient evidence existed to allow the jury to compare the fault of Venters.

Because there was no error in instruction Nos. 11, 12, and 14, we need not reach the harmless error step of the inquiry.

Affirmed.